## UNITED STATES v. SOUTHERN PACIFIC COMPANY ET AL.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 179.   Argued March 5, 6, 1919.—Decided November 17, 1919.

Lands valuable for oil and known to be so at the time of their selection by and patent to the Southern Pacific Railroad Company under the granting Act of July 27, 1866, c. 278, 14 Stat. 292, were excepted from the grant as mineral lands; and a patent for such lands, issued in reliance upon representations that the lands were not mineral, made by the company's officials when they believed the fact was otherwise, is subject to be set aside in a suit by the United States. Pp. 7 *et seq.*

In order to establish the character of lands, in this connection, as lands valuable for oil, it is not necessary that they shall have been demonstrated to be certainly such by wells actually drilled thereon and producing oil in paying quantities after a considerable period of pumping; it suffices if the conditions known at the time of patent, as to the geology, adjacent discoveries, and other indicia upon which men prudent and experienced in such matters are shown to be accustomed to act and make large expenditures, were such as reasonably to engender the belief that the lands contained oil of such quality and in such quantity as would render its extraction profitable and justify expenditures to that end.  P. 12.

In this case the conditions evincing oil value in this sense persisted

(1)

after the date of patent; and the court therefore does not consider the question whether, if such conditions were proven illusory by subsequent drilling, the demonstration would support the patent. P. 14.

A report of a special agent that lands embraced in a railroad selection were non-mineral, but made in another connection and not relied on by the railroad company in renewing the selection or considered by the land officers in approving it and issuing patent, can not avail against proof that the lands were known by the company to be valuable for oil; nor is it of value as evidence of their non-mineral character if based on a superficial examination by one who was neither a geologist nor familiar with oil-mining. *Id.*

249 Fed. Rep. 785, reversed.

THE case is stated in the opinion.

*Mr. J. Crawford Biggs,* Special Assistant to the Attorney General, and *Mr. Assistant Attorney General Kearful* for the United States.

*Mr. Charles R. Lewers,* with whom *Mr. William F. Herrin* and *Mr. Joseph P. Blair* were on the brief, for appellees:

Opinion or surmise that oil might exist, at an unknown depth, from four to ten miles from its nearest known occurrence is not convincing proof that the conditions in 1904 "were plainly such as to engender the belief that the land contained mineral deposits of such quality and in such quantity as would render their extraction profitable and justify expenditures to that end." *Diamond Coal Co.* v. *United States,* 233 U. S. 236, 240.

The "belief" here referred to must be a belief practically tantamount in its effect to actual knowledge, that is, a belief based on facts so complete as to exclude rational doubt. Even actual knowledge (or such a fully warranted belief) on the part of the railroad agents would not justify the relief here asked by the Government if it went merely to the existence of some oil somewhere within the area sued for. This knowledge (or belief) must be shown to

have also comprehended every element of location, quantity and quality which would have given this oil commercial availability and value under conditions then existing. Without such knowledge there could be no fraud, that is, there could be no consciousness that the Government was being deprived of land which it ought to retain.  The case of the Government is based on a theory which leaves out of consideration all questions of extent, position, availability or value of oil within the disputed areas.  It frankly attempts to obtain a decree on the ground that every acre in suit has that nebulous thing termed an "oil value," that is, a speculative value, because the surroundings are claimed to promise that perchance oil will be found somewhere in the Elk Hills.

If hope or suspicion that oil might be found somewhere in the Elk Hills can give to the particular lands in suit the requisite mineral character to warrant cancellation, the railroad company may lose by judicial decree lands which subsequent drilling may prove to fall unquestionably within its grant.  Such a result is hardly in accord with equity.

Only those lands may be lawfully taken from the railroad company which were in fact mineral lands at the time of patent.  *Burke* v. *Southern Pac. R. R. Co.*, 234 U. S. 669, 679–680; *Davis* v. *Weibbold*, 139 U. S. 507, 524; *Deffeback* v. *Hawke*, 115 U. S. 392; *Diamond Coal Co.* v. *United States*, 233 U. S. 236, 239.

It is fair to assume that in the use of the two terms "mineral lands" and lands "not mineral" in the various acts of Congress for the disposal of the public domain, all public lands were intended to be described.  "Mineral lands" were those which could be acquired under the mining laws.  Lands "not mineral" were disposed of by the homestead, railroad, school and other "non-mineral" grants.  *Cf. Benjamin* v. *Southern Pacific R. R. Co.*, 21 L. D. 390.

But, if the present contention of the Government is correct, there must be a third class not capable of disposal under any law. (see comment of Circuit Court of Appeals on this, 249 Fed. Rep. 797). It is conceded that a mineral patent would not issue for a single acre in the Elk· Hills on the showing of mineral made by the Government in this case, because the evidence is not sufficient to prove a *discovery* of mineral. *Chrisman* v. *Miller,* 197 U. S. 313. If there was not a sufficient "discovery" of oil on these lands to sustain a mining location, there obviously was not a discovery of oil sufficient to establish them as actually "valuable" oil lands. The word "discovery" in the mining laws means simply the ascertainment of the existence of the mineral, its disclosure. Unless these lands were known in 1904 to be actually valuable for the oil that was in them, the Government suffered no legal damage by their loss and the railroad company gained nothing not due it under its contract. Without legal damage to the Government there can be no relief on the ground of fraud. *Southern Development Co.* v. *Silva,* 125 U. S. 247; *United States* v. *San Jacinto Tin Co.,* 125 U. S. 273, 285; *United States* v. *Stinson,* 197 U. S. 200, 205.

The government case is founded entirely on the use of the word "belief" by this court in the case of *Diamond Coal Co.* v. *United States,* 233 U. S. 236, 239–240, without recognition, apparently, of the fact that the context indicates that what was there meant by "belief" was a conviction resulting from evidence so full and definite that it points with convincing force to a conclusion which includes not only the fact of the existence of the mineral but its extent and value as well. *United States* v. *Beaman,* 242 Fed. Rep. 876.

In the present case the mineral in question is oil, which is notoriously uncertain in its occurrence, extent and value as compared with coal; and the circumstances were such that a belief that these were valuable oil lands

could not have been a conviction that merchantable oil existed.

The fact that mere "indications" of the existence of oil are not proof of its existence or of its quantity or location has received judicial recognition on many occasions. *Brewster* v. *Lanyon Zinc Co.*, 140 Fed. Rep. 801, 806; *Nevada Sierra Oil Co.* v. *Home Oil Co.*, 98 Fed. Rep. 673, 675.

It is unsound to say that decisions under the mining law are here inapplicable because that law requires ocular demonstration of mineral in the land claimed. All that the word "discovery" means in that law (Rev. Stats., § 2320) is ascertainment of the existence of the vein or lode within the claim, and even in the case of a lode the exposure to the eye may be elsewhere. *Brewster* v. *Shoemaker*, 28 Colorado, 176, 182. The statute concerning placer claims makes no special requirement as to the actual place of discovery. The special statute of 1897 for the location of oil claims makes no change in this respect except the requirement that the proof show that the claim is "chiefly valuable" for oil (29 Stat. 525). Under the placer law it has been held that evidence of gold appearing within the claim, held insufficient in itself to constitute a discovery, might be supplemented by evidence showing greater amounts of gold disclosed in adjacent ground. These cases really hold that the evidence which actually constituted the full discovery came from without the claims. That such a condition might also exist as to an oil claim under exceptional facts is indicated by *Nevada Sierra Oil Co.* v. *Miller*, 97 Fed. Rep. 681, 688, 689. It is obvious that the practical question, with which the mining law is alone concerned, is whether there is valuable mineral within the claim. Evidence which certainly indicates this is discovery, no matter where the evidence is found, and the word "discovered" is used in the mining law in exactly the same sense in which it was used by this

court in the case of *Deffeback* v. *Hawke,* 115 U. S. 392, 404. Mere indications do not suffice.

Cases arising under the mining laws, in which it is held that oil is so uncertain in its occurrence and extent that surrounding conditions do not prove a discovery, are therefore directly in point. *Chrisman* v. *Miller,* 197 U. S. 313, 323; *Miller* v. *Chrisman,* 140 California, 444, 446; *Olive Land Co.* v. *Olmstead,* 103 Fed. Rep. 568; *United States* v. *McCutchen,* 238 Fed. Rep. 575, 591; *Bay* v. *Oklahoma Oil Co.,* 13 Oklahoma, 425; *Weed* v. *Snook,* 144 California, 439; *New England &c. Co.* v. *Congdon,* 152 California, 211; *McLemore* v. *Express Oil Co.,* 158 California, 559; *Dughi* v. *Harkins,* 2 L. D. 721; *Hutton* v. *Forbes,* 31 L. D. 325, 330; *Southwestern Oil Co.* v. *Atlantic &c. Ry. Co.,* 39 L. D. 335; *Butte Oil Co.,* 40 L. D. 602.

That belief not based on clear demonstration is not proof of mineral character, see also *Iron Silver Mining Co.* v. *Reynolds,* 124 U. S. 374; *Iron Silver Mining Co.* v. *Mike & Starr Co.,* 143 U. S. 394; *Sullivan* v. *Iron Silver Mining Co.,* 143 U. S. 431.

Fraud cannot be predicated upon the expression of an opinion concerning the existence of hidden mineral deposits. 2 Addison on Torts, Wood's ed., § 1186; *Southern Development Co.* v. *Silva,* 125 U. S. 247, 252; *Gordon* v. *Butler,* 105 U. S. 553; *Holbrook* v. *Connor,* 60 Maine, 578; *Synnott* v. *Shaughnessy,* 130 U. S. 572.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This is a suit by the United States to cancel a patent issued December 12, 1904, to the Southern Pacific Railroad Company for eight full and two partial sections of land within the indemnity limits of the grant made to that company by an act of Congress, c. 278, 14 Stat. 292, it being charged in the bill that the railroad company

fraudulently obtained the patent by falsely representing to the Land Department that the lands were not mineral but agricultural, when it was known that they were mineral. From the evidence presented the District Court found that the charge was true and entered a decree of cancellation, and this was reversed by the Circuit Court of Appeals, one judge dissenting. 249 Fed. Rep. 785.

"All mineral lands" other than those containing coal or iron were excluded from the grant, and this exclusion embraced oil lands. *Burke* v. *Southern Pacific R. R. Co.*, 234 U. S. 669, 676–679. As will be seen presently, there can be no doubt that the patent was procured by representing that the lands were not mineral. Whether this representation was false turns upon the character of the lands as known when the patent was sought and obtained. If they then were known to be valuable for oil, as the Government asserts they were, they were mineral in the sense of the granting act.

To compensate for losses to the grant within its primary limits the railroad company was entitled to select other lands of like area within the indemnity limits, approval by the Secretary of the Interior being essential to passing the selections to patent. The established mode of making the selections was by presenting at the local land office selection lists designating the lands lost and those selected, with supporting affidavits showing, among other things, that the lands selected were of the character contemplated, that is to say, were not mineral but agricultural. These lists and affidavits would then be examined in that office and in the General Land Office, and ultimately the selections would be passed to the Secretary of the Interior for his action. That course was followed here.

The original list was presented November 14, 1903, but it encountered obstacles which led to the presentation of a substituted list covering the same lands on Septem-

ber 6, 1904. Both lists were presented by the company's land agent, Mr. Eberlein, and were accompanied by affidavits made by him stating that the lands selected "are not interdicted mineral" but "are of the character contemplated by the grant" and that "he has caused" them "to be carefully examined by the agents and employees of said company as to their mineral or agricultural character, and that to the best of his knowledge and belief none of the lands returned in said list are mineral lands." In acting on the substituted list the officers of the Land Department relied upon and gave effect to the statements in the supporting affidavits, and the selections were accordingly approved and passed to patent.

In truth Mr. Eberlein had not examined the lands or caused them to be examined by others. Nor had any examination of them been made on behalf of the railroad company, save such as is inferable from the conduct of its geologists and others presently to be noticed.

The lands were in the Elk Hills in Kern County, California; were rough, semi-arid and unfit for cultivation; were devoid of timber, springs or running water, and had but little value for grazing. Oil had been discovered in that region as early as 1899 and this had been followed by development and production on an extensive scale. In 1903 and 1904 there were many producing wells about 25 miles to the east and many within a much shorter distance to the west and south, some within three or four miles. The railroad company was then maintaining a corps of geologists—all informed by experience in the California oil fields—and under their supervision was searching for, developing and producing oil for fuel purposes. In 1902, upon the recommendation of one of its geologists, it withdrew from sale many of its patented lands surrounding and adjacent to those in suit "because they were in or near oil territory"; and early in 1903 it entered upon a systematic examination of its lands in

that territory "to determine as far as can be done from surface indications and geological structure where oil is to be expected in this region." In a letter to Mr. Kruttschnitt, one of the company's vice presidents, the chief geologist said when about to take up the examination: "So far as I can judge from the trip I have just made over this territory, this work promises results of greatest value to the company."

The lands in suit were surveyed in 1901 and the approved plat was filed in the local land office in May, 1903. The field notes denominated the lands as mineral and described them as in a mineral district "within which many successful oil wells have been developed." As before stated, the original selection list was presented November 14, 1903. Mr. Kruttschnitt already had written to the company's attorney at Washington requesting that "special attention" be given to securing a patent for the lands when selected; and shortly thereafter Mr. Eberlein wrote to the attorney, saying: "I am particularly anxious in regard to this list as the lands adjoin the oil territory, and Mr. Kruttschnitt is very solicitous in regard to it." Other letters and telegrams show that this special concern or anxiety persisted until the patent was issued.

In 1903 the company concluded to lease such of its lands as were considered "valuable for oil purposes" to a subsidiary company which was to be a sort of fuel department and to have charge of the development and production of oil. The geologists were requested to designate the lands to be thus leased and as a result of their investigation and recommendation several sections adjacent to and some immediately adjoining those in suit were included. The lease was to be signed on behalf of the railroad company by Mr. Eberlein as land agent and was laid before him for that purpose on August 2, 1904. Perceiving at once that its execution would not be in ac-

¢ord with his action in pressing the pending selection list he took the matter up with some of his superiors. To one he said in a letter: "We have selected a large body of lands interspersed with the lands sought to be conveyed by this lease, and which we have represented as non-mineral in character. Should the existence of this lease become known it would go a long way toward establishing the mineral character of the lands referred to, and which are still unpatented. We could not successfully resist a mineral filing after we have practically established the mineral character of the land. I would suggest delay at least until this matter of patent can be adjusted." To the same officer he protested against the action of the geologists in examining unpatented lands because "it was charging the company with notice." And to another, in New York, he explained "all phases of the matter," with the result that the "impropriety of the lease at that time" and the "very ambiguous position in which we would be placed" were recognized and he was instructed to withhold his signature and to place and keep all correspondence and papers relating to the lease in a separate and private file not accessible to others. He followed the instruction and the special or secret file remained in his possession "until," as he testified, "it was pried out" at the hearing.

But notwithstanding what was brought to his attention through the proposed oil lease, Mr. Eberlein continued actively to press the pending selection, and when, about a month later, he presented the substituted selection list it was accompanied by affidavits wherein he repeated his prior representation that the lands were not mineral. After presenting this list he had a conference with the chief geologist which prompted the latter, when writing to a superior officer, to explain that "for reasons of policy regarding certain unpatented lands it will be best not to execute the lease . . . at present."

The lease was placed by Mr. Eberlein in the special or secret file and some time afterward, when an effort was made to find it, he denied all knowledge of it. The denial was brought to the attention of the chief geologist, and he at once wrote to Mr. Eberlein calling attention to the conference just mentioned, and stating: "You explained that you were rushing certain lands for final patent and that the immediate execution of the lease showing our idea of what were oil lands might interfere with you and we agreed to defer the execution/until that danger was passed." The chief geologist was a witness at the hearing and when asked what danger was meant, answered: "The danger that these lands might be delayed and not be patented because of their mineral character."

All that has been recited thus far is proved so well that it is beyond dispute. Fairly considered, it shows that when the patent was sought and obtained the lands had no substantial value unless for oil mining; that the interest and anxiety displayed by the company's officers in securing the patent were wholly disproportionate to the value of the lands for any other purpose; that the lands lay within a recognized and productive oil region which the company's geologists had been systematically examining to determine in what lands oil was to be expected, and that upon the advice and recommendation of its geologists the company was treating and dealing with adjacent and adjoining lands, of which it was the owner, as valuable for oil. Of course among practical men the character— whether oil or otherwise—of these adjacent and adjoining lands had some bearing on the character of those in suit, and this was given pointed recognition when the company's officers halted the signing of the proposed oil lease pending action on the selection list and caused the correspondence and papers relating to the lease to be secreted in a special and private file.

We think the natural, if not the only, conclusion from

all this is that in pressing the selection the officers of the railroad company were not acting in good faith, but were attempting to obtain the patent by representing that the lands were not mineral when they believed the fact was otherwise.

The observable geological and other physical conditions at the time of the patent proceedings, as shown by the evidence, were as follows: The area called the Elk Hills was about six miles wide and fifteen long and constituted an anticlinal fold or elongated dome—an occurrence favorable to the accumulation and retention of oil. The lands in suit were about its center. From five to ten miles to the west was the Temblor Range, the main uplift of that region. Along the east flank of that uplift for a distance of thirty miles was a series of outcrops or exposures of Monterey (diatomaceous) shales, the source of oil in California, and porous sandstone in which oil generally finds its ultimate reservoir. These strata were of exceptional thickness and it was apparent that oil in considerable quantity had been seeping or wasting from the sandstone. The dip of the strata was towards the Elk Hills and there were no indications of any faulting or thinning in that direction. Between the outcrop and the Elk Hills upwards of two hundred wells had found the oil-bearing strata and were being profitably operated, several of the wells being on a direct line towards the lands in suit and within three or four miles of them. In and beyond the Elk Hills were oil seepages and other surface indications of the existence of oil in the underlying strata, one of the seepages being near the lands in suit. Two wells had been sunk in the Elk Hills but obviously had not gone to an adequate depth and were not productive, although some oil was reached by one.

Geologists and men of wide experience and success in oil mining—all of whom had examined that territory and

some of whom had been familiar with it for years—were called as witnesses by the Government and gave it as their opinion, having regard to the known conditions in 1903 and 1904, as just outlined, that the lands were valuable for oil, in that an ordinarily prudent man, understanding the hazards and rewards of oil mining and desiring to engage therein for profit, would be justified in purchasing the lands for such mining and making the expenditures incident to their development, and in that a competent geologist or expert in oil mining, if employed to advise in the matter, would have ample warrant for advising the purchase and expenditure.

Other geologists and oil operators, called by the company, gave it as their opinion that the lands were not, under the conditions stated, valuable for oil; but as respects the testimony of some it is apparent that they were indisposed to regard any lands as within that category until they were demonstrated to be certainly such by wells actually drilled thereon and producing oil in paying quantities after a considerable period of pumping. This is a mistaken test, in that it takes no account of geological conditions, adjacent discoveries and other external conditions upon which prudent and experienced men in the oil mining regions are shown to be accustomed to act and make large expenditures. And the testimony of some of these witnesses is weakened by the fact that their prior acts in respect of these lands, or others in that vicinity similarly situated, were not in accord with the opinions which they expressed.

After considering all the evidence, we think it is adequately shown that the lands were known to be valuable for oil when the patent was sought and obtained, and by this we mean that the known conditions at that time were such as reasonably to engender the belief that the lands contained oil of such quality and in such quantity as would render its extraction profitable and justify ex-

penditures to that end.    See. *Diamond Coal Co.* v. *United States*, 233 U. S. 236.

The railroad company places some reliance on the fact that after the presentation of the original selection list and before the substituted one was tendered a special agent of the General Land Office examined the lands and reported them as non-mineral.    But there is nothing in this that can help the company.    The agent's report was made in another connection and was not considered by the land officers when they approved the selection.    It did not relieve the company from showing that the lands selected were not mineral; nor did the company under-stand that it had any such effect.    Mr. Eberlein knew of the report several months before he and other officers of the company became. troubled over the proposed oil lease and concluded that, if given publicity, it would en-danger the pending selection.    Besides, if the report could be considered here, it would be without any real evidential value, for it appears from testimony given by the agent at the hearing that he was not a geologist or familiar with oil mining and that his examination of the lands was at best only superficial.

The company makes the contention that drilling done since the patent was issued has demonstrated that the lands have no value for oil.    Assuming, without so de-ciding, that the contention would help the company if sustained by the evidence, we think it is not sustained. The drilling relied upon was done after 1909 upon lands in the Elk Hills other than those in suit.    Several wells were started and not more than three were successful. The three were the only ones that were drilled in favor-able locations and to an adequate depth, and they pene-trated oil sands of considerable thickness and produced a large quantity of oil, but were shut down for reasons not made clear by the record.    They were drilled by an oil company which was controlled by the railroad company.

The other wells failed for reasons which prevent the out-come from having any significance here.   In some the drilling was not carried to an adequate depth because the right to proceed was thought to be uncertain by reason of an executive withdrawal of the lands.

We conclude that the application of prior decisions to the case made by the evidence entitles the Government to the relief sought, as was held by the District Court.   See *United States* v. *Minor,* 114 U. S. 233; *McCaskill Co.* v. *United States,* 216 U. S. 504; *Diamond Coal Co.* v. *United States, supra; Washington Securities Co.* v. *United States,* 234 U. S. 76.

> *Decree of Circuit Court of Appeals reversed.*
> *Decree of District Court affirmed.*