## FILCHER et al. v. UNITED STATES et al.

(Circuit Court of Appeals, Ninth Circuit. August 24, 1925.)

No. 4535.

**1. Public lands ⟜82—Description of unsurveyed land in classification held sufficient.**

Under Act Feb. 26, 1895, § 3, providing for classification as mineral or nonmineral of lands in the Northern Pacific grant in Montana and Idaho, and that unsurveyed land be designated "by such natural or artificial boundaries" as the commission might determine designation of a tract of unsurveyed land by a section number *held* sufficient, where it was within a mile of a survey and could be located by the corner posts of such survey.

**2. Public lands ⟜97—Classification held valid.**

Issuance of a circular by the Commissioner of the General Land Office, committing the work of classifying lands, theretofore done by a commission, to the Geological Survey, *held* not to render invalid a classification thereafter made by the commission and approved by the department.

**3. Public lands ⟜108—Secretary of Interior held authorized to change classification of lands within railroad grant.**

Under a statute requiring a classification of lands within a railroad grant to be approved by the Secretary of the Interior, a classification made but not approved by him did not deprive him of jurisdiction to order a second classification.

**4. Public lands ⟜120—Patent held not subject to cancellation for fraud because of immaterial affidavit.**

Where land patented to the Northern Pacific Railway Company had previously been classified by the department pursuant to statute as nonmineral, and the classification approved, which rendered it conclusive, fraud, to invalidate the patent, cannot be predicated on affidavit of the agent of the railroad company to the list filed for patent, that land was vacant, unappropriated and not interdicted mineral land, which affidavit was not required, and did not affect the action of the department.

**5. Public lands ⟜120—Evidence of mistake in classification of land held not sufficient to invalidate patent.**

Evidence of mistake by the examiner who classified land as nonmineral *held* insufficient to invalidate the patent therefor.

**6. Public lands ⟜120—Land at time of classification held not known mineral land.**

A finding that land at the time of its classification as nonmineral was not known mineral land, or known to contain minerals of sufficient value to justify expenditure for their extraction, *held* sustained by the evidence.

Appeal from the District Court of the United States for the District of Montana; George M. Bourquin, Judge.

Suit in equity by the United States against the Northern Pacific Railway Company and others, wherein Ralph Filcher and others intervened. From the decree, interveners appeal. Affirmed.

For opinion below, see 1 F.(2d) 53.

The United States brought a suit against the Northern Pacific Railway Company, the Florence Mining Company, and Joseph Kuntz, Jr., to cancel as to certain portions of section 9 in township 1 south, range 4 west, Montana meridian, the patent to said section issued on June 16, 1916, to said railway company as within the grant to the Northern Pacific Railroad Company, its predecessor in interest under the Act of Congress of July 2, 1864 (13 Stat. 365); the said land having thereafter been leased by the railway company to the other defendants in the suit. The appellants herein intervened in the suit, alleging that in 1901 said section 9 had been duly classified in the Land Office at Helena as mineral land; that on January 1, 1904, the intervener Jones located thereon a quartz lode mining claim, and in 1909 located a second quartz lode mining claim thereon, both of which he still owns, and that at the time when the railway company applied for its patent it knew or had means of knowing that the land was mineral and appropriated by said claims; that on January 1, 1910, the intervener Filcher relocated on said section a lode mining claim known as the Never Pay claim, which was subsequently acquired by the intervener Schmidt. The interveners prayed that the patent issued to said section 9 to be canceled and set aside as to the land covered by said three lode claims. Issue was joined by the answers of the railway company and its codefendants to said complaint and said petitions in intervention. Thereafter, upon the testimony taken upon the issues, the court below found the equities to be with the defendants, and adjudged and decreed

that the bill of complaint and the petitions in intervention be dismissed with costs. From that decree the appeal is taken.

M. M. Duncan, of Virginia City, Mont., and E. B. Howell, of Butte, Mont., for appellants.

Grafton Mason, of St. Paul, Minn., and M. S. Gunn, Carl Rasch, and E. M. Hall, all of Helena, Mont., for appellees Northern Pac. Ry. Co. and others.

Before GILBERT, HUNT, and RUDKIN, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). The Act of February 26, 1895 (28 Stat. 683), created a special tribunal to examine and classify as mineral or nonmineral the odd-numbered sections of the land grant to the Northern Pacific Railroad Company in Montana and Idaho, the surveyed lands to be described by legal subdivisions, the unsurveyed lands to be designated by "such natural or artificial boundaries to identify them, as the commissioners may determine" (section 3) and further provided that no patent should issue to the railroad company until after such examination and classification. Under that act the land herein involved was in the year 1901 classified as mineral, but the classification was not approved by the Secretary. The Act of June 25, 1910 (36 Stat. 739), transferred to the Commissioner of the General Land Office the authority to examine and classify the lands subject to the approval of the Secretary. In 1913 section 9 was again examined and was classified as nonmineral. Notice of the classification was published in compliance with the statute, and no protest was made thereto. The act provided that, in the absence of protest upon approval of the classification by the Secretary, the classification should be final "except in case of fraud." In January, 1915, the second classification was approved by the Secretary. At the time of the second examination the land, although unsurveyed, was within a mile of surveyed sections in the same township. In the classification and in the published notice the land was described as section 9. In 1914 it was surveyed. In October, 1915, the railway company filed its list of lands, including section 9, and in June, 1916, the patent issued.

It is alleged in the bill of complaint and the petitions in intervention that the patent was procured by fraud and mistake; that by mistake the mineral examiner Lindsay, who made the examination in 1913, failed to examine certain portions of section 9;

that he erroneously believed that the interveners' three lode mining claims were in what would be, when surveyed, section 10; that the Secretary, by a promulgated rule, had committed the field work of classification to the United States Geological Survey, whereas said mineral examiner was not connected with said survey; that the railway company knew, or ought to have known, of said examiner's mistakes; that the act of 1895 was violated, in that the land, which had not then been surveyed, was described as section 9, whereas it should have been described by natural or artificial boundaries and permanent monuments; that the land at all times was of known mineral character, other than iron or coal, and subject to mineral location by the interveners. The court below made no findings of fact, but reached a conclusion adverse to the said allegations.

[1] It is contended that the Lindsay classification was void, for that it described unsurveyed land by legal subdivision, contrary to the requirement of the law. The statute did not prescribe for unsurveyed lands a survey by metes and bounds. It directed only that they be designated by such "natural or artificial boundaries as to identify them as the commissioners may determine." To designate the unsurveyed section as section 9 was to adopt artificial boundaries already established by prior surveys. Section 9 was identifiable as such by its relation to the adjacent surveyed lands in the same township; there being a quarter section post between four sections a mile west of the northwest corner thereof. The commissioner evidently determined that to designate the land in terms of a future survey was to give the most accurate notice of its boundaries that could be given, and we see no ground to question the controlling effect of his determination. West v. Rutledge Timber Co., 244 U. S. 90, 37 S. Ct. 587, 61 L. Ed. 1010; Hammer v. Garfield Mining Co., 130 U. S. 291, 9 S. Ct. 548, 32 L. Ed. 964.

[2] Nor do we think that the classification should be held void from the fact that under the Act of June 25, 1910, the Commissioner of the General Land Office had issued a circular committing to the United States Geological Survey the work of examining lands which theretofore was performed by commissioners. Notwithstanding the issuance of the circular, no reason appears why examinations could not have been made under the practice theretofore existing, the whole matter of its rules and regulations being under the control of and alterable by the Land Department.

[3] It is contended that the survey of 1901, classifying the land as mineral, followed by a notice duly published as required by law, was a valid and binding classification, notwithstanding that it was not approved. Section 6 of the act required the Secretary's approval of the classifications. There having been no approval of the survey of 1901, the fact that the Secretary directed a second classification to be made was a valid expression of his disapproval of the first. To the commissioner he wrote, on November 21, 1911, that he did not "deem it advisable or proper to approve the submitted lists or other unapproved classifications * * * without further information as to their character." Clearly he had jurisdiction to order the second classification. It is the general rule that the Land Department has jurisdiction over the public lands until the legal title has passed. Love v. Flahive, 205 U. S. 195, 199, 27 S. Ct. 486, 51 L. Ed. 768.

[4] The appellants predicate fraud upon the affidavit of the eastern land agent of the railway company, which is said to have been false in stating that section 9 was vacant, unappropriated, and not interdicted mineral land, and they assert that during the two years between the Lindsay classification and the date of the affidavit the land had been surveyed and the railway company had the opportunity to investigate it as it was its duty to do. The affidavit was evidently made in compliance with the circular of instructions No. 7 of 1879, requiring all lists of lands to be verified by the land agent of the applicant showing them to be vacant, unappropriated, not interdicted mineral, not reserved, and of the character contemplated by the grant. But the purpose of the Act of February 26, 1895, was to ascertain and determine finally the mineral character of the lands included in this particular grant within the borders of two named states, and obviously the land agent accepted the classification made under the act as a determinative and final adjudication of their character. The affidavit required by the circular of instructions of 1879 was not the affidavit which was under consideration in United States v. Southern Pac. Co., 251 U. S. 1, 40 S. Ct. 47, 64 L. Ed. 97, which was made under a rule prescribing that the land agent set forth that he had caused the lands mentioned "to be carefully examined * * * as to their mineral or agricultural character."

That an affidavit in compliance with the circular of 1879 was unnecessary is made clear by the letter of Secretary Hitchcock to the Commisisoner of the General Land Office of February 15, 1900, in which he wrote: "As the classification provided for in the Act of February 26, 1895, is, upon its approval by the Secretary of the Interior, made final, except in case of fraud, so far as regards the adjustment of the grant to the Northern Pacific Railroad Company, you will not require of said company any showing bearing upon the character of any lands within the limits of its grant which have been classified under the act referred to." We think that the court below properly held that the affidavit was superfluous, not having been relied upon in issuing the patent. In Lee v. Johnson, 116 U. S. 48, 6 S. Ct. 249, 29 L. Ed. 570, the court said: "It is not enough, however, that fraud and imposition have been practiced upon the Department, or that false testimony or fraudulent documents have been presented; it must appear that they affected its determination, which otherwise would have been in favor of the plaintiff. He must in all cases show that but for the error or fraud or imposition of which he complains, he would be entitled to the patent; it is not enough to show that it should not have been issued to the patentee."

[5] The contention that there was mistake in the identity of the land examined by Lindsay is based upon the contents of his report as tested by oral evidence in regard to the actual mineral development upon the land. His report contained only the following: "There is an iron dike extending through a part of this section which has been worked to a limited extent, on the adjoining section to the east. The work consists of open cuts; the character of the iron is hematite. I was informed that some shipments were made; the same being used for fluxing. The property has been abandoned for many years and is now open for relocation." It is argued that, as Lindsay's report locates on the adjoining section to the east the point where the work was done, he could not have investigated section 9, as there was but the one cut from which fluxing iron had been shipped in that vicinity, namely the Never Pay claim on section 9. It does not follow from the fact that Lindsay supposed the Never Pay claim to be on section 10 that he did not investigate the mineral character of section 9. He made no error in finding that the iron dike traversed a portion of that section, and his mistake in locating the mining works upon the next adjoining section was not, we think, of such a vital nature as to invalidate the patent which was issued upon the Secretary's classification of the land. It was not a mistake upon which a charge of

imposition or fraud could be based, and we are of the opinion that the court below properly held that the evidence failed of that high degree demanded by equity to impeach successfully and cancel a land patent. Diamond Coal Co. v. United States, 233 U. S. 236, 239, 34 S. Ct. 507, 58 L. Ed. 936.

[6] In addition to the foregoing considerations, which we deem conclusive of the merits of the controversy, the trial court gave careful scrutiny to the testimony which was adduced for and against the contention that the land was at the time of the classification known mineral land, and found that the evidence did not establish the existence of lodes within the section, and that in reasonable probability the land was valuable for, and had been located and to some extent worked for, iron for fluxing purposes, to which a small percentage of gold and silver added but incidental value; the existence of iron, the principal known mineral in the land, not having the effect to exclude the land from the grant, and that at the time of the classification the land was not known to contain other minerals in quality and quantity sufficient to render their extraction profitable and justify expenditures in the expectation of a reasonable return. Said the court: "If ever there was reason to believe this section 9 was mineral in character because of gold and silver, desultory development, poor results, increased cost in mining and smelting and lapse of time had overcome it at time of classification made and approved." We have examined the testimony, and we are not persuaded that the conclusion of the trial judge before whom it was taken in open court, should be disturbed.

The decree is affirmed.