UNITED STATES *v.* SWEET, ADMINISTRATOR OF SWEET.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 99.   Argued December 19, 1917.—Decided January 28, 1918.

Section 6 of the Utah Enabling Act of July 16, 1894, c. 138, 28 Stat. 107, purports to grant to the State upon her admission sections 2, 16, 32 and 36 in every township, reserving lands embraced in permanent reservations, etc., but making no mention of mineral lands. Section 10 provides that land granted by the act for educational purposes "shall not be subject to preëmption, homestead entry, or any other entry under the land laws of the United States, whether surveyed or unsurveyed, but shall be surveyed for school purposes only." *Held,* that the school section grant was not intended to embrace land known to be valuable for coal.

It is the settled policy of Congress to dispose of mineral lands only under laws specially including them. This is evinced by very numerous enactments, beginning even with the Ordinance of May 20, 1785. It was expressed in its application to all grants, whether to a State or not, by the particular acts whence came the general and permanent provisions on the subject found in §§ 2318 and 2346 of the Revised Statutes, and was even more firmly established by the mining laws as a whole.

Taken collectively, the mining laws (including the coal land laws), constitute a special code upon the subject of mineral lands, intended not only to establish particular modes of disposing of such lands,

but also to except and reserve them from all other grants and modes of disposal where there is no express provision for their inclusion.

The school land indemnity act of February 28, 1891, c. 384, 26 Stat. 796, in providing for lieu selections where sections 16 and 36 are mineral, affords a plain implication that those sections are not to pass under the grant if known to be mineral when the grant takes effect.

The school land grant to Utah must be read in the light of the mining laws (which have always applied in Utah), the school land indemnity law, *supra*, and the settled policy of Congress respecting mineral lands, and not as if it constituted the sole evidence of the legislative will. As it contains no language certainly showing an intention to depart from such policy, or explicitly or clearly withdrawing from the operation of the mining laws the designated sections when known to be mineral, its general terms cannot be held to include them.

This conclusion is fortified by the fact that, although Utah was known to be rich in minerals as well as salines, the Enabling Act in its extensive grants is silent as to minerals but includes an express grant of salines; also by the committee reports in Congress, uniform construction by the Land Department, and the Act of May 3, 1902, c. 683, 32 Stat. 188, declaring that as to Utah the school land indemnity law of February 28, 1891, *supra*, shall apply to sections 2 and 32 as well as 16 and 36.

*Cooper* v. *Roberts*, 18 How. 173, distinguished and some of its observations disapproved.

228 Fed. Rep. 421, reversed.


THE case is stated in the opinion.


*Mr. Assistant Attorney General Kearful* for the United States.


*Mr. A. C. Ellis, Jr.*, with whom *Mr. W. H. Dickson* was on the brief, for appellee:

Section 6 of the Utah Enabling Act must be taken according to the plain meaning of its words. There is no exception or even mention in it of mineral lands; but other matters excepted are enumerated with particularity

which shows the more clearly that no exception of mineral land could have been intended. The same is true of the entire statute, which does not mention mines or minerals, much less except them. Section 10 furthermore declares that these school sections were under no circumstances to be subject to entry "under the land laws" of the United States—the mineral laws, necessarily, as well as the non-mineral.

The Utah Constitution, Art. X, undertook to provide for the sale of "minerals" from "school lands." This was a construction of § 4 of the Enabling Act as granting mineral lands, and this construction was acquiesced in by the general Government through the President when he accepted and proclaimed the constitution as in accordance with the act.

The grant being absolute on its face and perfectly clear and unequivocal, the courts cannot engraft upon it an exception. *Motion Picture Patents Co.* v. *Universal Film Mfg. Co.*, 243 U. S. 502, 510; *Carey* v. *Donohue*, 240 U. S. 430; *United States* v. *Missouri Pacific Ry. Co.*, 213 Fed. Rep. 169, 173; *Hobbs* v. *McLean*, 117 U. S. 567, 579, 580; Sutherland, Stat. Constr., § 328.

The policy of the Government is to be found in its statutes, its court decisions and the constant practice of its officials. The policy from the beginning has been to deal bounteously with the common schools, definitely to grant the school sections. Exceptions should not be allowed unless the statute itself contains them. *Cooper* v. *Roberts*, 18 How. 173, 177; *s. c.*, 20 How. 467, 484, 485; *Beecher* v. *Wetherby*, 95 U. S. 517. There has been no uniform policy to except mineral land from such grants. Some enabling acts do and some do not. The Oklahoma Act expressly recognizes that minerals may pass to the State (34 Stat. 273), and this immediately preceded the Utah Act. Besides, the act being plain, the courts cannot vary it to suit their ideas of policy—the intention must

be gathered from the words. [Citing many cases.] Section 2318, Rev. Stats., applies only where the disposition of mineral land is not "otherwise directed by law," which is not this case. *Minnesota* v. *Hitchcock*, 185 U. S. 373, 391; *Hamilton* v. *Rathbone*, 175 U. S. 414, 421. Besides, the Enabling Act repeals all acts and parts of acts in conflict with it.

*Mining Co.* v. *Consolidated Mining Co.*, 102 U. S. 167; *Deffeback* v. *Hawke*, 115 U. S. 392; and *Heydenfeldt* v. *Daney Gold & Silver Mining Co.*, 93 U. S. 634, are readily distinguishable.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This is a suit by the United States to quiet the title to section 32 of a designated township in Carbon County, Utah, the suit being specially directed against a claim asserted by the defendant, as an assignee of the State, under the school land grant to the latter. Whether this tract passed to the State under that grant or was reserved to the United States as mineral land is the matter in controversy. In the District Court the United States prevailed as to all but 40 acres, but in the Circuit Court of Appeals that decree was reversed and one for the defendant was directed. 228 Fed. Rep. 421.

The evidence shows that the entire section, excepting 40 acres, is valuable for coal and has been known to be so since before Utah became a State. Land valuable for coal is mineral land within the meaning of the public land laws. Thus the ultimate question for decision is whether the school land grant to Utah embraces mineral land. The grant is found in § 6 of the Act of Congress of July 16, 1894, c. 138, 28 Stat. 107, and is copied in the margin [1]

---

[1] Sec. 6. That upon the admission of said State into the Union, sections numbered two, sixteen, thirty-two, and thirty-six in every town-

with another closely related section of the same act. It neither expressly includes mineral lands nor expressly excludes them. If it did either, it would be conclusive of the will of Congress upon the point. But, as it makes no mention of such lands, it is permissible—indeed, is essential—to inquire whether the congressional will is otherwise made manifest, that is to say, whether the general words of the grant are to be read in the light of other statutes and a settled public policy in respect of mineral lands.

In the legislation concerning the public lands it has been the practice of Congress to make a distinction between mineral lands and other lands, to deal with them along different lines, and to withhold mineral lands from disposal save under laws specially including them. This practice began with the ordinance of May 20, 1785, 10 Journals of Congress, Folwell's ed., 118, and was observed

---

ship of said proposed State, and where such sections or any parts thereof have been sold or otherwise disposed of by or under the authority of any Act of Congress other lands equivalent thereto, in legal subdivisions of not less than one quarter section and as contiguous as may be to the section in lieu of which the same is taken, are hereby granted to said State for the support of common schools, such indemnity lands to be selected within said State in such manner as the legislature may provide, with the approval of the Secretary of the Interior: *Provided,* That the second, sixteenth, thirty-second, and thirty-sixth sections embraced in permanent reservations for national purposes shall not, at any time, be subject to the grants nor to the indemnity provisions of this Act, nor shall any lands embraced in Indian, military, or other reservations of any character be subject to the grants or to the indemnity provisions of this Act until the reservation shall have been extinguished and such lands be restored to and become a part of the public domain.

Sec. 10. That the proceeds of lands herein granted for educational purposes, except as hereinafter otherwise provided, shall constitute a permanent school fund, the interest of which only shall be expended for the support of said schools, and such land shall not be subject to preëmption, homestead entry, or any other entry under the land laws of the United States, whether surveyed or unsurveyed, but shall be surveyed for school purposes only.

with such persistency in the early land laws [1] as to lead this court to say in *United States* v. *Gratiot*, 14 Pet. 526, "It has been the policy of the government, at all times in disposing of the public lands, to reserve the mines for the use of the United States," and also to hold in *United States* v. *Gear*, 3 How. 120, that an act making no mention of lead-mine lands and providing generally for the sale of "all the lands" in certain new land districts, "reserving only" designated tracts, "any law of Congress heretofore existing to the contrary notwithstanding," could not be regarded as disclosing a purpose on the part of Congress. to depart from "the policy which had governed its legislation in respect to lead-mine lands," and so did not embrace them. A like practice prevailed in respect of saline lands, and in *Morton* v. *Nebraska*, 21 Wall. 660, where a disposal of such lands under an act providing generally for the sale of lands in certain Territories was drawn in question, this court said that it could not be supposed "without an express declaration to that effect" that Congress intended by such an act to permit the sale of saline lands and thus to depart from "a long-established policy by which it had been governed in similar cases."

While the early land laws occasionally and specially provided for the sale of mineral lands, they very generally evinced a purpose to reserve such lands for future disposal; and this purpose was given particular emphasis following the discovery of gold in California in 1848, as is shown in the Oregon donation act, the homestead act (which

---

[1] Acts May 18, 1796, c. 29, § 2, 1 Stat. 464; March 3, 1807, c. 46, § 2, 2 Stat. 445; March 3, 1807, c. 49, § 5, 2 Stat. 448; February 15, 1811, c. 14, § 10, 2 Stat. 617; March 3, 1811, c. 46, § 10, 2 Stat. 662; May 6, 1812, c. 77, § 1, 2 Stat. 728; February 17, 1815, c. 45, § 1, 3 Stat. 211; March 25, 1816, c. 35, § 1, 3 Stat. 260; April 29, 1816, c. 164, 3 Stat. 332; March 3, 1829, c. 55, 4 Stat. 364; September 4, 1841, c. 16, § 10, 5 Stat. 453; July 11, 1846, c. 36, 9 Stat. 37; March 1, 1847, c. 32, 9 Stat. 146; March 3, 1847, c. 54, 9 Stat. 179; September 26, 1850, c. 72, 9 Stat. 472; Public Domain (Donaldson), 306.

adopted the mineral land reservation of the preëmption act of 1841), the grant to the several States for the benefit of agricultural colleges, the railroad land grants and other land acts of that period.[1]  Noticeable among those acts is one which, in dealing with grants to Nevada and surveys in that State, declared, "in all cases lands valuable for mines of gold, silver, quicksilver, or copper shall be reserved from sale," c. 166, 14 Stat. 85, and another declaring, "no act passed at the first session of the thirty-eighth congress, granting lands to states or corporations, to aid in the construction of roads or for other purposes, or to extend the time of grants heretofore made, shall be so construed as to embrace mineral lands, which in all cases shall be, and are, reserved exclusively to the United States, unless otherwise specially provided in the act or acts making the grant."  13 Stat. 567.  Although applied in one instance to lands in Nevada and in the other to grants made at a particular session of Congress, these declarations were but expressive of the will of Congress that every grant of public lands, whether to a State or otherwise, should be taken as reserving and excluding mineral lands in the absence of an expressed purpose to include them; and upon this theory both declarations were carried into the Revised Statutes as being general and per-

---

[1] Acts September 27, 1850, c. 76, §§ 5, 14, 9 Stat. 496; February 14, 1853, c. 69, § 7, 10 Stat. 158; July 22, 1854, c. 103, § 4, 10 Stat. 308; May 20, 1862, c. 75, § 1, 12 Stat. 392; May 30, 1862, c. 86, §§ 7, 10, 12 Stat. 409; July 1, 1862, c. 120, § 3, 12 Stat. 489; July 2, 1862, c. 129, § 3, 12 Stat. 503; July 2, 1862, c. 130, 12 Stat. 503; July 2, 1864, c. 216, §§ 4, 19, 13 Stat. 356; July 2, 1864, c. 217, § 3, 13 Stat. 365; June 21, 1866, c. 127, § 1, 14 Stat. 66; July 4, 1866, c. 166, § 5, 14 Stat. 85; July 23, 1866, c. 219, § 1, 14 Stat. 218; July 25, 1866, c. 242, §§ 2, 10, 14 Stat. 239; July 27, 1866, c. 278, § 3, 14 Stat. 292; July 28, 1866, c. 300, § 1, 14 Stat. 338; June 21, 1860, c. 167, § 6, 12 Stat. 71; July 4, 1866, c. 165, 14 Stat. 83; May 4, 1870, c. 69, 16 Stat. 94; March 3, 1871, c. 122, § 9, 16 Stat. 573; Lindley on Mines, 3d ed., § 47.

manent in their nature—the first in enlarged terms as § 2318,[1] and the other as § 2346.

By the Act of March 3, 1853, c. 145, 10 Stat. 244, Congress granted to the State of California sections 16 and 36 in each township for school purposes and large quantities of lands for other purposes. Mineral lands were neither expressly excepted from nor expressly included in the grant of the school sections, but were specially excepted from the other grants. This difference led to a controversy over the true meaning of the school grant, the state authorities taking the view that it did, and the land officers of the United States that it did not, include mineral lands. Ultimately the controversy came before this court in *Mining Co.* v. *Consolidated Mining Co.*, 102 U. S. 167, and the position taken by the land officers of the United States was sustained, the court saying, p. 174:

"Taking into consideration what is well known to have been the hesitation and difficulty in the minds of Congressmen in dealing with these mineral lands, the manner in which the question was suddenly forced upon them, the uniform reservation of them from survey, from sale, from preëmption, and above all from grants, whether for railroads, public buildings, or other purposes, and looking to the fact that from all the grants made in this act they are reserved, one of which is for school purposes besides the sixteenth and thirty-sixth sections, we are forced to the conclusion that Congress did not intend to depart from its uniform policy in this respect in the grant of those sections to the State.

"It follows from the finding of the court and the undisputed facts of the case, that the land in controversy being mineral land, and well known to be so when the surveys of it were made, did not pass to the State under the school-section grant."

---

[1] Sec. 2318. In all cases lands valuable for minerals shall be reserved from sale, except as otherwise expressly directed by law.

That ruling was reaffirmed and followed in *Mullan* v. *United States*, 118 U. S. 271, where valuable coal lands, known to be such, were held not to be open to selection by the State as indemnity school lands.

The conditions ensuing from the discovery of gold and other minerals in the western States and Territories resulted in a general demand for a system of laws expressly opening the mineral lands to exploration, occupation and acquisition, and Congress, responding to this demand, adopted from 1864 to 1873 a series of acts dealing with practically every phase of the subject and covering all classes of mineral lands, including coal lands.[1] These acts, with some before noticed, were carried into a chapter of the Revised Statutes entitled "Minerals Lands and Mining Resources." Taken collectively they constitute a special code upon that subject and show that they are intended not only to establish a particular mode of disposing of mineral lands, but also to except and reserve them from all other grants and modes of disposal where there is no express provision for their inclusion. Thus the policy of disposing of mineral lands only under laws specially including them became even more firmly established than before, and this is recognized in our decisions. *Mining Co.* v. *Consolidated Mining Co., supra,* 174; *Deffeback* v. *Hawke,* 115 U. S. 392, 402; *Davis* v. *Weibbold,* 139 U. S. 507, 516. And while the mineral-land laws are not applicable to all the public land States, some being specially excepted,[2] there has been no time since their enactment when they were not applicable to Utah.

---

[1] Acts July 1, 1864, c. 205, § 1, 13 Stat. 343; March 3, 1865, c. 107, § 1, 13 Stat. 529; July 26, 1866, c. 262, 14 Stat. 251; July 9, 1870, c. 235, 16 Stat. 217; May 10, 1872, c. 152, 17 Stat. 91; March 3, 1873, c. 279, 17 Stat. 607.

[2] Michigan, Wisconsin, Minnesota, Missouri, Kansas, Alabama and Oklahoma have been wholly or partly excepted. Acts February 18, 1873, c. 159, 17 Stat. 465; May 5, 1876, c. 91, 19 Stat. 52; March 3,

Another statute indicative of the policy of Congress and pertinent to the present inquiry is the Act of February 28, 1891, c. 384, 26 Stat. 796, which defines the indemnity to which a State or Territory is entitled in respect of its school grant. In addition to dealing with deficiencies occurring in other ways, it provides, "And other lands of equal acreage are also hereby appropriated and granted, and may be selected by said State or Territory where sections sixteen or thirty-six are mineral land." In this there is a plain implication that where those sections are mineral—known to be so when the grant takes effect—they do not pass under the grant. And it does not militate against this implication that under another provision the State may surrender those sections and take other lands in lieu of them where, although not known to be mineral when the grant takes effect, they are afterwards discovered to be so. See *California* v. *Deseret Water &c. Co.*, 243 U. S. 415.

What has been said demonstrates that the school grant to Utah must be read in the light of the mining laws, the school land indemnity law and the settled public policy respecting mineral lands, and not as though it constituted the sole evidence of the legislative will. *United States* v. *Barnes*, 222 U. S. 513, 520. When it is so read it does not, in our opinion, disclose a purpose to include mineral lands. Although couched in general terms adequate to embrace such lands if there were no statute or settled policy to the contrary, it contains no language which explicitly or clearly withdraws the designated sections, where known to be mineral in character, from the operation of the mining laws, or which certainly shows that Congress intended to depart from its long prevailing policy of disposing of mineral lands only under laws specially including them.

1883, c. 118, 22 Stat. 487; March 3, 1891, c. 543, 26 Stat. 1026; June 6, 1900, c. 813, 31 Stat. 680.

It therefore must be taken as neither curtailing those laws nor departing from that policy.

This conclusion is fortified by other considerations. When the grant was made Utah was known to be rich in minerals and salines. Besides this grant the act contains others aggregating 1,570,080 acres. In none is there any mention of mineral lands. As to 110,000 acres there is an express inclusion of saline lands. This silence as to mineral lands, when contrasted with the special inclusion of saline lands, indicates that the former are not included. See *Montello Salt Co.* v. *Utah*, 221 U. S. 452, 466. The committees of Congress, upon whose recommendation the act was passed, construed it as not embracing mineral lands, for in their reports [1] they stated that "All mineral lands are exempt from any grant made under the act." The Land Department has uniformly placed the same construction upon it.[2] And Congress acted upon that construction when, by the Act of May 3, 1902, c. 683, 32 Stat. 188, it declared that as to the State of Utah "all the provisions" of the school land indemnity law of February 28, 1891, before noticed, should apply to sections 2 and 32 as well as to sections 16 and 36,—the grant to that State covering all of these sections instead of the latter two as in other western States.

The case of *Cooper* v. *Roberts*, 18 How. 173, is relied upon as making for a different conclusion. Part of a school section in Michigan known to be mineral was there in controversy and was held to have passed to the State under its school grant. At the time the section was surveyed, which was the date when the grant was to take effect, there was a statute which in a single section provided for

---

[1] House Report No. 162, 53d Cong., 1st sess., p. 18; Senate Report No. 414, 53d Cong., 2d sess., p. 19.

[2] *Utah* v. *Allen*, 27 L. D. 53; *Richter* v. *Utah*, 27 L. D. 95; *State of Utah*, 29 L. D. 69; *State of Utah*, 32 L. D. 117; *Mahoganey No. 2 Lode Claim*, 33 L. D. 37; *Charles L. Ostenfeldt*, 41 L. D. 265.

the sale of mineral lands, and also of other lands, and concluded with a reservation of the school sections "from such sales." The real question was whether those sections were reserved from both classes of sales, and this the court answered in the affirmative. Some observations in the opinion are not in accord with our present conclusion. These were relied upon in *Mining Co.* v. *Consolidated Mining Co., supra,* as our records show, and were in effect disapproved. Besides, when they were made the public policy respecting mineral lands had not been expressed in general and permanent laws, such as were afterwards enacted and carried into the Revised Statutes. See Lindley on Mines, 3d ed., § 136. The case, therefore, is neither controlling nor persuasive here.

It results that the decree of the Circuit Court of Appeals must be reversed and that of the District Court affirmed.

*It is so ordered.*

MR. JUSTICE MCREYNOLDS did not participate in the consideration or decision of this case.