## DUNBAR LIME CO. v. UTAH–IDAHO SUGAR CO.

(Circuit Court of Appeals, Eighth Circuit. December 20, 1926.)

No. 7459.

1. **Public lands** ☞54(10)—Claimant in possession may attack title of adverse claimant, though based on United States grant.

Claimant in possession may defend his possession by attacking title of adverse claimant, though based on grant from United States.

2. **Public lands** ☞42—Mineral lands, unless expressly included, are excluded from grants to state.

Under the settled policy of the government, mineral lands, unless expressly included, are excluded from grants to states.

3. **Public lands** ☞52—Land chiefly valuable for limestone deposits held not to pass under grant of school lands to Utah; "mineral" (Utah Enabling Act, § 6).

Limestone is a "mineral" within the purview of the public land laws, and land known to

be chiefly valuable for its calcite deposits at the time of the admission of Utah as a state did not pass under the grant of school lands made in its Enabling Act, § 6 (28 Stat. 107).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Mineral.]

**4. Public lands** ⬡⟿52—**Timber and Stone Act and Building Stone Act held not to apply to land chiefly valuable for limestone deposits; "stone" Act Aug. 4, 1892, § 1, and § 2, amending Act June 3, 1878, § 1 [Comp. St. §§ 4633, 4671]).**

Act Aug. 4, 1892, § 1, and section 2, amending Timber and Stone Act, June 3, 1878, § 1 (Comp. St. §§ 4633, 4671), providing for sale of timber and stone lands and authorizing entry of lands chiefly valuable for building stone under the placer mining laws, but excluding from their operation, inter alia, lands donated to states for school purposes, do not apply to lands chiefly valuable for calcite deposits, which is not "stone" within the meaning of the acts, and cannot be quarried for building stone, though it may be used in the manufacture of building materials.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Stone.]

**5. Public lands** ⬡⟿52—**Land held excluded from school land grant to Utah as "known mineral land" (Utah Enabling Act, § 6).**

A finding that a tract of land within the limits of the school land grant to Utah in its Enabling Act, § 6 (28 Stat. 107), had large outcroppings of cacite plainly visible, and was of little or no value for agricultural or grazing purposes, *held* to characterize it as "known mineral land," excluded from the grant.

In Error to the District Court of the United States for the District of Utah; Tillman D. Johnson, Judge.

At Law. Action by the Dunbar Lime Company against the Utah-Idaho Sugar Company. Judgment for defendant, and plaintiff brings error. Affirmed.

Mahlon E. Wilson, of Salt Lake City, Utah (Albert R. Barnes, of Salt Lake City, Utah, on the brief), for plaintiff in error.

Richard W. Young, of Salt Lake City, Utah, for defendant in error.

Before KENYON, Circuit Judge, and SCOTT and SANBORN, District Judges.

KENYON, Circuit Judge. Plaintiff in error (hereafter designated plaintiff) brought action in the District Court of the United States for the District of Utah against defendant in error (hereafter designated defendant) claiming possession of approximately 321 acres of land in Tooele county, Utah. Plaintiff claimed its right to possession thereof by virtue of a lease and agreement entered into April 24, 1924, between the state land commissioner of the state of Utah, lessor, and Ira R. Browning and L. C. Doty, lessees, granting the exclusive right and privilege to mine and dispose of all the limestone minerals upon said lands. Plaintiff is the assignee of the rights of said Browning and Doty.

Plaintiff's theory is that by section 6 of the Enabling Act of the state of Utah these lands passed to the state in 1894. Defendant's contention is that the lands were mineral in their nature; that the grant to the state of Utah, relied upon by plaintiff, was not intended to and did not cover mineral lands, and that the lands in question never passed to the state of Utah; that they were open to entry and location under the mining laws of the United States; that on the 26th day of June, 1919, one Munding and one Moon made certain locations under said mining laws; that one McCoy on the 6th day of March made another lode location, and Munding and Moon also made another one on March 8, 1924. Defendant claims the rights of the various locators. A jury was waived in writing. The court made findings of fact and conclusions of law, which findings and conclusions will be subsequently discussed, and hence need not be set out at this point. The general conclusion of the court was that plaintiff was not entitled to judgment.

[1] The first point urged by plaintiff is that the attack of defendant upon its title is a collateral one; that, the court having found a grant to the state and a lease by the state to plaintiff's assignors, the same were conclusive against defendant, and that the United States was the only party who could question the grant. The court found that defendant was in possession of this property. We have a situation then of a party in possession of lands under some claim of right from the government of the United States having that possession challenged. Plaintiff, in order to question this possession, must show a better right of title in itself. 32 Cyc. 823. If the title passed by the Enabling Act of the state of Utah, then plaintiff's title is superior to any claim of defendant. If, however, the state of Utah never received these lands from the government and had no title whatever to them, then the state is in no position to transfer any rights therein to plaintiff. The very gist of this case is whether the Enabling Act did transfer these particular lands to the state. There is no contention that any patent has ever been issued for these lands or that the Land Department has made any investigation concerning them or passed on their character as mineral lands;

nor that there has been any certification to the state or any survey thereof ever made. Plaintiff's theory is that the grant in itself was sufficient to pass the title, regardless of any certification or of any surveys. We see no reason why the defendant in possession of the lands has not the right to assert that plaintiff seeking to oust it from possession has no title, even though it may claim to have received the same from some federal grant. If these particular lands had in fact passed to the state of Utah, then of course defendant would not be in position to attack plaintiff's title collaterally. Therefore we think the question raised as to collateral attack is determined by the decision of the other questions in the case.

Section 6 of the Enabling Act of Utah is as follows:

"That upon the admission of said state into the Union, sections numbered two, sixteen, thirty-two, and thirty-six in every township of said proposed state, and where such sections or any parts thereof have been sold or otherwise disposed of by or under the authority of any act of Congress other lands equivalent thereto, in legal subdivisions of not less than one quarter section and as contiguous as may be to the section in lieu of which the same is taken, are hereby granted to said state for the support of common schools, such indemnity lands to be selected within said state in such manner as the Legislature may provide, with the approval of the Secretary of the Interior: Provided, that the second, sixteenth, thirty-second, and thirty-sixth sections embraced in permanent reservations for national purposes shall not, at any time, be subject to the grants nor to the indemnity provisions of this act, nor shall any lands embraced in Indian, military, or other reservations of any character be subject to the grants or to the indemnity provisions of this act until the reservation shall have been extinguished and such lands be restored to and become a part of the public domain." 28 U. S. Stat. L. c. 138, p. 107, § 6.

[2] There has been for some time a settled policy of the general government that public lands of a mineral character, unless expressly included, are excluded from grants to the states. 22 R. C. L. § 80, p. 333. In Mining Co. v Consolidated Mining Co., 102 U. S. 167, 26 L. Ed. 126, the court held that the grant of the sixteenth and thirty-sixth sections of public land to the state of California for school purposes made by the Act of March 3, 1853 (10 Stat. 246), was not in-

17 F.(2d)—23

tended to cover mineral lands, because such lands were impliedly excluded by the settled policy of the government. This case has been followed down through a line of cases such as Mullan & Another v. United States, 118 U. S. 271, 6 S. Ct. 1041, 30 L. Ed. 170, and Davis' Administrator v. Weibbold, 139 U. S. 507, 11 S. Ct. 628, 35 L. Ed. 238, to practically the last direct word on the subject in United States v. Sweet, Administrator of Sweet, 245 U. S. 563, 38 S. Ct. 193, 62 L. Ed. 473, where the very section involved here of the Utah Enabling Act was construed, and 't was held that the school section grant to the state of Utah thereby was not intended to embrace land known to be valuable for mineral at the time of the admission of the state, and the court says (567, 571, 572 [38 S. Ct. 193]):

"In the legislation concerning the public lands it has been the practice of Congress to make a distinction between mineral lands and other lands, to deal with them along different lines, and to withhold mineral lands from disposal save under laws specially including them. * * * And while the mineral land laws are not applicable to all the public land states, some being specially excepted, there has been no time since their enactment when they were not applicable to Utah. * * * What has been said demonstrates that the school grant to Utah must be read in the light of the mining laws, the school land indemnity law and the settled public policy respecting mineral lands, and not as though it constituted the sole evidence of the legislative will. United States v. Barnes, 222 U. S. 513, 520 [32 S. Ct. 117, 56 L. Ed. 291]. When it is so read it does not, in our opinion, disclose a purpose to include mineral lands. Although couched in general terms adequate to embrace such lands if there were no statute or settled policy to the contrary, it contains no language which explicitly or clearly withdraws the designated sections, where known to be mineral in character, from the operation of the mining laws, or which certainly shows that Congress intended to depart from its long prevailing policy of disposing of mineral lands only under laws specially including them. It therefore must be taken as neither curtailing those laws nor departing from that policy."

The lands in controversy are situated in sections 2 and 36 of respective townships and are therefore within the very language of the grant.

In Work, Secretary of the Interior, v. Louisiana, 269 U. S. 250, 46 S. Ct. 92, 70 L.

Ed. 259, the Supreme Court draws a distinction between the grants of the Swamp Land Acts of 1849–50 (Rev. St. § 2479 et seq. [Comp. St. § 4958 et seq.]), and later acts, holding that, at the time of the enactment of the Swamp Land Acts the public policy of holding mineral lands for disposition only under laws specially including them was not established, but reaffirms the general doctrine that there has been in more recent years an established public policy of reserving mineral lands generally. The substance of the whole matter is that the government has had for years a fixed policy of dealing with mineral lands in a different manner from other lands, and in a grant of government land to a state there is an implied reservation of mineral lands. It seems to us the Supreme Court in the case of United States v. Sweet, supra, has settled the question that the grant to Utah, claimed to convey the land in question here, does not include mineral lands. While coal is the mineral considered in the Sweet Case, the general doctrine as to exclusion of mineral lands from the grant is clearly announced. This case would therefore seem to be reduced to the question as to whether or not these lands were mineral lands.

[3] Was the court's conclusion that these lands were mineral lands justified from the findings of fact? The court's finding on this was:

"(6) That prior to the time of the admission of the state of Utah into the Union the lands above described were vacant, unreserved, and unappropriated lands, rough, broken, and mountainous in character, and of no value for agricultural purposes, and of slight, if any, utility for grazing purposes; that said lands above described did not, at the time of the admission of Utah into the Union or at any time since or now, contain any gold, silver, lead, or other precious metals; that, outside of and except for the limerock contained upon said land there was and is no other mineral of any kind or character to be found thereon or therein; that said land did contain a large quantity of limerock recrystallized in character, containing approximately 55 per cent. of lime and 44 per cent. of carbon, known as calcite; that there were and are large deposits of said limestone upon said lands; that at the time of statehood, and ever since, there have been outcroppings of this limestone or calcite of such magnitude and prominence as to be readily observable by any one going upon the ground; and that said limestone would have been readily classified as calcite by any one

familiar with such a deposit; and for that reason the court finds that this deposit of calcite was well known at the time of statehood."

The Supreme Court of the United States, in Northern Pacific Railway Co. v. Soderberg, 188 U. S. 526, 536, 537, 23 S. Ct. 365, 369 [47 L. Ed. 575] passed upon the meaning of the term mineral lands, and reviewed the decisions of other courts on this question both in this country and in England, and, while not attempting to give an exact definition of the words "mineral lands," says: "Indeed, we are of opinion that this legislation consists with, rather than opposes, the overwhelming weight of authority to the effect that mineral lands include not merely metalliferous lands, but all such as are chiefly valuable for their deposits of a mineral character, which are useful in the arts or valuable for purposes of manufacture."

This court, in Webb v. American Asphaltum Mining Co., 157 F. 203, 205, said: "The 'mineral deposits' treated in this legislation include nonmetalliferous deposits, alum, asphaltum, borax, guano, diamonds, gypsum, resin, marble, mica, slate, amber, petroleum, limestone, and building stone, as well as deposits bearing gold, silver, and other metals, and the term 'lands valuable for minerals' in the law means all lands chiefly valuable for any of these mineral deposits rather than for agricultural purposes."

In Morrill v. N. P. R. R. Co., 30 Land Dec. 475, 480, it is said: "It cannot be questioned that limestone is a mineral substance, and as the testimony shows that the lands in controversy have an actual value for the deposits of limestone contained therein, and are more valuable on account of such deposits than for agricultural purposes, they fall clearly within the rule announced in the authorities cited, and are accordingly held to be mineral lands within the meaning of the United States Mining Laws."

In Pacific Coast Marble Co. v. Northern Pac. R. R. Co., 25 Land Dec. 233, it is said: "That whatever is recognized as a mineral by the standard authorities on the subject, whether of metallic or other substances, when the same is found in the public lands in quantity and quality sufficient to render the land more valuable on account thereof than for agricultural purposes, should be treated as coming within the purview of the mining laws."

Lindley on Mines, § 98, lays down certain rules for determining the mineral or nonmineral character of lands as follows:

"The mineral character of land is estab-

lished when shown to have upon it, or within it, such a substance as (a) is recognized as mineral according to its chemical composition by the standard authorities on the subject; or (b) is classified as a mineral product in trade or commerce; or (c) such a substance (other than the mere surface which may be used for agricultural purposes) as possesses economic value for use in trade, manufacture, the sciences or the mechanical or ornamental arts.

"And it is demonstrated that such substance exists therein or thereon in such quantities as render the land more valuable for the purpose of removing and marketing the substance than for any other purpose, and the removing and marketing of which will yield a profit; or it is established that such substance exists in the lands in such quantities as would justify a prudent man in expending labor and capital in the effort to obtain it."

From the findings of the court it is apparent that the deposits upon these lands were not common limestone, but in a recrystallized form consisting of 55 per cent. lime and 44 per cent. of carbon, known as calcite. Dana, Mineralogy (12th Ed.) p. 399, defines calcite as follows: "Calcite is calcium carbonate, CaCo , equals carbon dioxide 44, lime 56, equals 100."

The Americana, vol. 5, p. 159, gives this definition: "Pure crystals (of this mineral) have the composition carbon dioxide 44 per cent., lime 56 per cent."

The trial court found that the calcite deposit upon the land was valuable as a flux in smelting, and also for use in sugar factories for clarifying sugar, and as an ingredient for making Portland cement and white plaster. This finding would seem to bring the lands clearly within the third rule as to mineral lands laid down in Lindley on Mines heretofore set out. In its opinion the court said: "I do not deem it necessary to discuss these cases because, under the definition given by the Supreme Court in Northern Pacific Railway Co. v Soderberg, supra, 'that mineral lands include not merely metalliferous lands, but all such as are chiefly valuable for their deposits of a mineral character, which are useful in the arts or valuable for purposes of manufacture,' I conclude that this deposit of calcite is a mineral and subject to location as such under the mineral laws of the United States."

[4] Counsel for plaintiff, in the very able and ingenious argument presented, take the position that the case of United States v.

Sweet, 245 U. S. 563, 38 S. Ct. 563, 62 L. Ed. 473, and Northern Pacific Railway Co. v. Soderberg, 188 U. S. 536, 23 S. Ct. 365, 47 L. Ed. 575, do not apply to this case, for the reason that under the Act of June 3, 1878, and the amendment thereto, known as the Timber and Stone Act of August 4, 1892, the federal intent appears that lands valuable chiefly for stone suitable for building or other purposes, so long as characterized as stone, are not to be reserved from such grant as that contained in section 6 of Utah's Enabling Act; that there is no settled policy as to stone lands. The relevant parts of said acts are as follows:

"Surveyed public lands of the United States within the public land states, not included within military, Indian, or other reservations of the United States, valuable chiefly for timber, but unfit for cultivation, and which have not been offered at public sale according to law, may be sold to citizens of the United States, or persons who have declared their intention to become such, in quantities not exceeding one hundred and sixty acres to any one person or association of persons, at the minimum price of two dollars and fifty cents per acre; and lands valuable chiefly for stone may be sold on the same terms as timber lands: Provided, that nothing herein contained shall defeat or impair any bona fide claim under any law of the United States, or authorize the sale of any mining claim, or the improvements of any bona fide settler, or lands containing gold, silver, cinnabar, copper, or coal, or lands selected by the said states under any law of the United States donating lands for internal improvements, education, or other purposes. * * *" 5 U. S. Comp. Stat. p. 5726, § 4671; Act June 3, 1878, c. 151, § 1, as amended, Act Aug. 4, 1892, c. 375, § 2. Sale of timber and stone lands.

"Any person authorized to enter lands under the mining laws of the United States may enter lands that are chiefly valuable for building stone under the provisions of the law in relation to placer mineral claims, provided, that lands reserved for the benefit of the public schools or donated to any States shall not be subject to entry under this act." 5 U. S. Comp. Stat. § 4633; Act Aug. 4, 1892, c. 375, § 1. Entry of building stone lands under placer mining laws."

The purpose of the Act of August 4, 1892 (5 U. S. Comp. Stat. § 4633), was evidently to clear up an uncertain and doubtful situation arising by conflicting decisions of the Land Department and it settles the policy of

the United States that lands chiefly valuable for building stone are not subject to entry under the mining laws as against a grant thereof to the states for educational purposes. Prior to the passage of that act, owing to various decisions of the Land Department, there had been uncertainty as to whether lands of value chiefly because of the building-stone were embraced within the term "mineral lands," and subject to entry under the mining statutes. The Land Department in 1891, in Conlin v. Kelly, 12 Land Dec. 1, had held that land containing stone useful only or chiefly for building purposes was not subject to entry and appropriation under the mining laws. Congress thereafter enacted the Act of August 4, 1892, as an amendment to the act of 1878, known as the Timber and Stone Act, and thereby lands chiefly valuable for building stone were made subject to entry under placer mining acts. With respect to lands having stone chiefly valuable for other uses, the law remained the same. If plaintiff could have shown these lands were valuable chiefly for building stone under the act of 1892, then they would not have been reserved to the government as mineral lands. The finding of the court on this was:

"(7) And the court further finds that the calcite deposit upon this land is and was valuable as a flux in smelting and also for use in sugar factories for clarifying sugar, and is and was valuable as an ingredient in making Portland cement and white plaster; that said stone cannot be quarried into blocks and used for building purposes; that at least such use is not and would not be practical; that said calcite can be used for the making of artificial stone for building purposes."

The fact that the calcite might be used in making artificial stone for building purposes or as an ingredient in making Portland cement and white plaster, as found by the court, does not make the same building stone within the meaning of the act of 1892. The court found as a question of fact that the lands in controversy were not chiefly valuable for building stone. The findings of fact are not disputed or questioned, so that finding would seem to end that question.

In its opinion the trial court said: "I conclude, therefore, that the lands in question do not come within the proviso contained in the Building Stone Act of August 4, 1892, to the effect that lands reserved for the benefit of public schools or donated to any state shall not be subject to entry under the act."

Plaintiff claims, however, that the Act of June 3, 1878, takes from any implied reservations of a grant lands chiefly valuable for stone. We are not called upon to determine whether the act of 1892 changed the act of 1878 by clarifying a doubtful situation, as would seem to be its purpose, for the reason that the findings of the court amount to a finding that the lands in controversy were not chiefly valuable for stone. The finding is that they were chiefly valuable for the mineral, calcite. While the court did not seem to regard the act of 1878 as of special significance, and did not make a special finding thereon, the findings made clearly negative any claim that the lands were chiefly valuable either for building stone or any other stone, unless it can be said that limerock is such stone as is contemplated by the act of 1878. We think it cannot so be claimed. The act of 1892 was the one in effect when Utah was admitted as a state, and is, we think, the governing act. It may be conceded that up to that time there was no fixed policy of the government as to whether lands valuable for stone or building stone were to be considered as mineral land. However, at the time Utah was admitted to the Union as a state there was a fixed policy that mineral lands were excluded by implication from grants to the state. In the face of the Sweet Case, no other theory can be successfully advanced.

We have examined the various decisions of the Land Department, cited by counsel for plaintiff to sustain the contention that limestone lands are not mineral lands, and find that in most cases the lands were held to be building stone lands and chiefly valuable for such purposes, or that the deposits thereon were not considered as minerals. The court's finding of fact was that the deposit of calcium was useful in many ways, particularly in the manufacture of Portland cement and white plaster. Its conclusion that the lands were mineral was well founded and amply sustained by the authorities.

[5] The remaining question is whether the lands involved were in 1896 known to be chiefly valuable for mineral purposes. The finding of the trial court No. 6, hereinbefore set out, covers this question. Plaintiff contends that this finding is not sufficient to show that the lands in 1896 were known to be chiefly valuable for mineral purposes. It was not necessary that there be known mines upon the property. In Diamond Coal & Coke Co. v. United States, 233 U. S. 236, 242, 34 S. Ct. 507, 510 (58 L. Ed. 936) the court said: "There was nothing upon their surface showing the presence of coal be-

neath, nor anything indicating that the bed outcropping on the east and dipping to the west did not pass through them." And on page 239 (34 S. Ct. 509): "To justify the annulment of a homestead patent as wrongfully covering mineral land, it must appear that at the time of the proceedings which resulted in the patent the land was known to be valuable for mineral; that is to say, it must appear that the known conditions at the time of those proceedings were plainly such as to engender the belief that the land contained mineral deposits of such quality and in such quantity as would render their extraction profitable and justify expenditures to that end." See, also, United States v. Southern Pacific Co. et al., 251 U. S. 1, 40 S. Ct. 47, 64 L. Ed. 97; Milner et al. v. United States (C. C. A.) 228 F. 431; State of Utah v. Braffet, 49 Land Dec. 212.

It seems to be the rather clear holding of the courts and the Land Department that the doctrine of geological deduction may be applied as to lands upon which there may be no outcroppings showing mineral conditions. In this case the situation is stronger, for the court finds there were large outcroppings of calcite on the land in 1896, and of such prominence as to be readily discernible.

The test is whether the situation in 1896 disclosed that the land contained minerals sufficient in quantity and quality to make profitable their extraction and to justify the outlay of expense with the hope of reasonable returns. Filcher et al. v. United States et al. (C. C. A.) 7 F.(2d) 519. The court's finding as to the value of the limestone, viz. 15 cents to $1 per ton, would not seem to indicate a substantial profit from the production of the same. It is apparent, however, from the tenacity with which both parties to this controversy attempt to secure the limestone, that it is of value sufficient to justify its extraction from the ground. The court's declaration of law was as follows:

"That because said lands are valuable only for the above-described deposits of calcite contained therein, and because the outcroppings of said deposits were, at the time of Utah's admission into the Union, readily observable to any one going upon the ground above described, then it follows as a matter of law that said lands were of a known mineral character prior to and at the time Utah became a state, and that the title to said lands did not pass from the United States to the state of Utah by section 6 of Utah's Enabling Act, but that said title to said lands was impliedly reserved from the operation of said grant contained in said act, and it follows as a matter of law that the ownership of said lands is, and at all times mentioned since statehood has been, in the United States government and that neither the state of Utah nor the plaintiff has any interest or right in and to said lands or the stone contained therein."

We are satisfied this conclusion was justified from the findings of fact. The only question before us is whether the findings of fact are sufficient to sustain the judgment entered. The question of the rights between the government and the defendant is, of course, not here. The trial court held the ownership of the land was in the United States government. Counsel for plaintiff conclude the brief with the statement that the judgment, if sustained, will create an intolerable condition of insecurity and uncertainty of titles. To a degree it is true, but that is a question for the legislative department of the government, and not for the judicial. That the state of Utah and its officials have recognized that the remedy is legislative is apparent from the fact that a bill was introduced in the Senate of the United States January 16, 1926, by Senator Smoot of Utah, the title of which contains this language: "To assure title in the several states to lands granted to them in aid of public or common schools, and to limit the period for the institution of proceedings to establish an exception of lands from such grants because of their known mineral character."

The judgment of the trial court is affirmed.