Robert E. DUNAVANT, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. PB–C–77–233.

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

June 8, 1981.

Jerry E. Mazzanti, Drew & Mazzanti, Lake Village, Ark., for plaintiff.

A. Doug Chavis, Asst. U. S. Atty., Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

OREN HARRIS, Senior District Judge.

The plaintiff, Robert E. Dunavant, brings this action against the United States of America pursuant to the provisions of the Federal Tort Claims Act. 28 U.S.C. § 2671 et seq. Title 28, § 2674 provides that the United States shall be liable, respecting the provisions relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances.

The plaintiff is the owner and in possession of real property consisting of agricultural acreage and improvements of certain lands in Chicot County, Arkansas. This land is adjoining but outside of the Mississippi River levee.

The incidents which gave rise to this federal tort claim action occurred at a time when the plaintiff was the owner and in possession of farm lands located in Chicot County, Arkansas. During the year 1976, the plaintiff, as he had done in farming the land for a number of years, planted soybean and cotton crops upon his lands.

The mainline Mississippi River levees were built across various types of material which had been deposited by the meanderings of the river channel over hundreds of years. Many of the deposits provide little resistance to underground flow of seepage water caused by high river stages. These weak areas of porous deposits tend to jeopardize the integrity of flood control levees up and down the Mississippi River.

The mainline levees of the Mississippi River have been developed by the Corps of Engineers, Department of the Army as authorized by the Congress from on or about the time of the 1927 flood. The development of this program has been largely through the Corps of Engineers with the control and guidance of the Mississippi River Commission.

At the request of the Mississippi River Commission, approximately 1962, the Vicksburg District of the Corps of Engineers developed a program for completion of the main stem Mississippi River levees. Included was a requirement for a comprehensive subsurface investigation to identify portions of the levee susceptible to the underseepage problem. Subsequently, as part of the program to complete the Mississippi River levee system as authorized by the Flood Control Act of 1928, as amended [33 U.S.C. § 702a et seq.], a program was initiated for the systematic design and construction of landside seepage berms in the Vicksburg District. This particular program identified a need for underseepage control for about 246 miles of mainline levee in the Vicksburg District, which includes an area currently occupied by the Walker Bend berm.

The original design and right-of-way requirements for the Walker Bend berm were based on the Project Design Flood Flowline computed in 1956. Plans and specifications were completed in 1969 which included the relocation of an existing county road parallel to the landside toe of the seepage berm. This relocated county roadway was designed with numerous cross-drains to allow the rainfall runoff from the berm to enter the natural drainage system which flowed in a westernly direction away from the levee.

As a result of the 1973 flood experience, the Corps of Engineers decided that the Project Flood Design Flowline should be revised upward some 4.6 feet in the vicinity of Walker Bend, Arkansas. This revision required a somewhat larger berm for underseepage control. Plans and specifications were revised accordingly.

The plaintiff, Robert E. Dunavant, owned in excess of 250 acres of land adjoining the Walker Bend Arc landside seepage berm beginning at the northern end and extending south along the landside berm for some distance. Mr. Dunavant had farmed these lands in question for many years. He primarily produced cotton and soybeans. The northern most part of the plaintiff's land

was located between the beginning of the berm on the northern end and a substantial body of water known as Lake Chicot. This area is recognized as some of the most productive farming lands in the entire Mississippi Delta.

In order to construct what is known as the Walker Bend berm, a right-of-way was requested by the Corps of Engineers on March 16, 1974. Subsequently, approximately 89 acres of land owned by the plaintiff, Dunavant, was condemned by the Southeastern Arkansas Levee District. This land, on which a substantial part of the berm was to be constructed, was condemned in order to begin the work, pending a determination of the value of the land and just compensation.

The Corps of Engineers contends that having to condemn the property owned by Mr. Dunavant delayed acquisition of right-of-way and hence, postponed the initiation of the construction until July 8, 1975. It is undisputed and it should be noted, however, that the Corps of Engineers had been aware of the problem of landside seepage and sand boils within the levee along this area since 1962 and had given consideration toward correcting the recognized dangerous situation during the years from 1962 to 1976. Having completed the designs, plans, and specifications, the Corps of Engineers entered into a contract for the construction of the particular berm involved in this litigation in July, 1975. For some undisclosed reason, however, the construction work on the Project ceased in November, 1975 with substantial work to be done for its completion.

As previously noted, it was necessary to move the old road which was next to the levee and construct a new road parallel to the levee some 140 yards from the levee. This new road was designed to be approximately 30 feet wide and to have side ditches two to four feet deep to provide for water runoff at the completion of the Project.

The berm itself was constructed by building up the soil from the toe of the levee toward the new road in excess of 400 feet with a two percent slope.

1. Soil Survey, Chicot County, Arkansas. Defendant's Exhibit 19.

It was established that the type of soil from the toe of the levee extending to and substantially over the land of the plaintiff, including the area over which the berm was constructed, was known as commerce soil. The soils in the commerce series developed from Mississippi River alluvium. They are slightly acid to mildly alkaline and drain moderately well. Up to fifty-five inches in depth, it contains grayish-brown, very friable silt loam. The moisture capability is very high, permeability moderate. It is the type of soil which would absorb water some ten times as fast as would clay type soil.[1]

The levee, as a part of the Flood Control Project of the mainline Mississippi River levee, was constructed at various heights, up to twenty feet or more in places, for protection of waters from the Mississippi River. The outside of the levee had a slope of twenty percent. The berm consisted of heavy clay soil which was placed on top of the commerce soil and packed. It is approximately 4.6 feet deep, beginning at the toe of the levee with a two percent slope to the relocated road. This area of the approximately 89 acres of the condemned land was conditioned to give protection to the levee against the underwater flow from the river to the levee. The underwater flow caused sand dunes and water seepage at high stages of the river. Consequently, this area, known as the berm, was virtually water proof with hardly any absorption of water falling on it or flowing over it.

Drainage ditches were to be constructed on both sides of the relocated road substantially larger and more efficient than the ditches of the old road nearer the levee. These ditches were designed to control the water from the flow of water off the berm from the levee. It is quite apparent that if the contractor had not ceased its construction of this project, designed to protect the levee as a part of the Flood Control Project, and had completed the relocation and construction of the road together with the ditches as finally completed, very little of

the excessive rainfall that occurred in May, June, and July of 1976, would have overflowed the plaintiff's land. Hence, there would not have been damages from the loss of production of cotton and soybeans for the crop year.

Under the direction and supervision of representatives of the Corps of Engineers, Department of the Army, the contractor completed the construction of this project on September 16, 1976.

Due to substantial rain in the area, the plaintiff, Dunavant, on January 2, 1976, contacted the Corps of Engineers, i. e., the Area Engineer at McGehee, Arkansas. This was his first contact with the office of the Corps of Engineers. He advised them of the drainage problem and the effect it was apparently having on his property. The Area Engineers, with Mr. Dunavant present, examined his property and concluded that the amount of water over Dunavant's fields did not appear to be excessive. Further investigation by the Area Engineer on January 5, 1976, revealed very little drainage had occurred to the new roadway and that the seepage water had virtually drained the fields of Mr. Dunavant.

As time passed, there were additional rains in the area. Mr. Dunavant contacted the Area Engineer's office and the District Engineer's office in Vicksburg, Mississippi on several occasions, complaining of the problem from the runoff water of the berm flowing into and upon his fields.

On January 30, 1976, personnel from the Division Engineer's office together with personnel from the Construction Division of the Corps of Engineers examined the problem area to determine the feasibility of enlarging the roadside ditches to better contain the rainfall from the berm surface. No immediate action was taken.

Following a substantial rain, about the 27th of February, 1976, the District Engineer directed the Engineering Division personnel to determine the responsibility for the rainfall runoff and to take any corrective measures necessary. Some interim corrective work was undertaken but provided no relief.

The plaintiff contends that because there was no sodding on the clay, there was nothing to retain the water on the berm. This produced a rapid runoff without proper drainage and, caused him severe damage through the loss of crop production in the year 1976.

This action was filed against the United States of America by the plaintiff, Robert E. Dunavant, on November 3, 1977, seeking damages of a substantial sum. An administrative claim and complaint had previously been filed with the United States government, Department of the Army, Vicksburg District, Corps of Engineers, Vicksburg, Mississippi, July 8, 1976, in the sum of $131,154.00. The claim was denied by letter dated May 5, 1976, by the Chief, General Claims Division, U.S. Army Claims Service, Office of the Judge Advocate General.

In the plaintiff's brief, filed October 25, 1976, in response to a motion for summary judgment and motion to dismiss for lack of subject matter jurisdiction, counsel for the plaintiff contended that the claim of the plaintiff was cognizable under the Federal Tort Claims Act. He stated the damages plaintiff sought were sustained as a result of the "operational level" negligence by the defendant. This negligence created an impediment to existing drainage causing runoff and drainage waters from the berm to flow across, through and upon the lands of the plaintiff.

The government on January 28, 1979, filed a motion for summary judgment and motion to dismiss for lack of subject matter jurisdiction. It was the contention of the government that the plaintiff's claim was not cognizable under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. The government further contended that even if the actions of the United States of America through the Corps of Engineers were cognizable under the Federal Tort Claims Act, the claim could not be allowed because it falls within the "Discretionary Function" exception of the Act, i. e., 28 U.S.C. § 2680 and thus the Court was without jurisdiction to hear the complaint.

Further, it was the contention of the government that the 1928 Flood Control Act, specifically 33 U.S.C. § 702c, provides immunity to the United States of America from liability for damage caused by natural floods wherein the government had initiated a flood control program.

In view of a substantial conflict within various Circuit Courts of Appeals, the Court denied the motion of the government for summary judgment and motion to dismiss for lack of subject matter jurisdiction and scheduled a hearing. This hearing, conducted by the Court, commenced on June 18, 1980.

Numerous witnesses were heard for both the plaintiff and the United States of America. At the completion of the hearing, counsel for the parties were permitted to file briefs. These have been received and the case has been submitted for decision.

From the statements of counsel at the opening of the trial, the testimony of witnesses, exhibits entered thereto, and the post-trial briefs filed by counsel on behalf of the parties, the Court makes the following findings of fact and conclusions of law incorporated herein pursuant to Rule 52 of the Federal Rules of Civil Procedure.

The first and primary question for the Court's consideration is whether Title 33, § 702c provides complete immunity for the United States of America. The second question for the Court's consideration and determination is whether the Federal Tort Claims Act, Title 28 § 2671 et seq., repealed or modified § 702c which provides immunity to the United States of America. If this second question is answered affirmatively, that is if the Court determines that the Federal Tort Claims Act repealed or modified the immunity provision of § 702c, the third question for the Court's determination would be whether under the provisions of Title 28, § 2680(a) the design, construction and acts of the government which resulted in damages to the plaintiff come within the exception of "discretionary function" and therefore relieves the government of any liability.

*FIRST*: In enacting the Flood Control Act of 1928 which became effective May 15, 1928, c.569, § 3, 45 Stat. 535, the Congress provided in § 3 [33 U.S.C. § 702c]:

> * * * No liability of any kind is attached to or rests upon the United States for any damage from or by floods or flood waters at any place. * * *

It is established, and both parties admit, the mainline levees of the Lower Mississippi River were authorized and provided for by the Congress of the United States pursuant to the Flood Control Act of 1928, supra. It is further established and undisputed that the Mississippi River levee which is referred to as Walker Bend, Arkansas, was threatened with damage or destruction by underwater seepage as a result of high water from the Mississippi River through what is referred to as sand boils. This required modification of the levee and strengthening from some kind of support mechanism. From the testimony, there were a number of methods which could have been utilized to control the underwater seepage problem which was adversely affecting and threatening the levee. The Corps of Engineers decided to use the method known as "Earth Berm". There was testimony that this method was decided upon in lieu of the other methods for financial and engineering reasons. Theoretically, however, any of the methods would have sufficed but in the discretion of the Corps of Engineers, the earth berm was chosen to relieve the problem. Within the office of the Corps of Engineers, Vicksburg, Mississippi, the design and specifications determined to be appropriate for the berm were developed. Pursuant to advertisement for bids, a contract to build the berm was awarded to a private contractor. Construction began in July, 1975.

Subsequently during the year, it became noticeable that the water from rains would flow toward the plaintiff's fields. This was called to the attention of the Corps of Engineers and there was some modification of the design project. The government claims that the construction was delayed due to the requirement of obtaining right-of-way. It is established the contractor performed

very little work from November, 1975 until July or August in 1976. In the interim, it is an established fact that the representatives of the Corps of Engineers were responding to the complaints of the plaintiff. There were substantial rains during the year and especially during the months of May, June, and July.

The plaintiff claims and insists that § 702c of Title 33 does not apply to "man-made floods" which result solely from negligent acts. Counsel for the plaintiff relies· upon the cases of *Guy F. Atkinson Co. v. Merritt, Chapman, and Scott Corp.*, 126 F.Supp. 406, (N.D.Calif.1954) and *Valley Cattle Co. v. U.S.A.*, 258 F.Supp. 12 (D.Haw.1966). From a review of these cases, it is quite apparent that they are inapposite to the instant case.

As already stated, some Courts have denied immunity to the government when damage is caused solely by governmental negligence in the absence of a natural disaster. *Graci v. U.S.A.*, 456 F.2d 20 (5th Cir. 1971); *Hayes v. U.S.*, 585 F.2d 701 (4th Cir. 1978); *Seaboard Coastline Railroad Co. v. U.S.A.*, 473 F.2d 714 (5th Cir. 1973).

Our own Eighth Circuit Court of Appeals has considered this question and construed § 702c on numerous occasions. The landmark decision decided by the Eighth Circuit Court of Appeals is the *National Mfg. Co. v. U.S.A.*, 210 F.2d 263 (8th Cir. 1954). In *National Mfg. Co.*, our Eighth Circuit Court of Appeals held that provisions of the Flood Control Act of 1928 were carried forward into the 1936 Flood Control Act which decreed that no liability of any kind would attach to or rest upon the United States for any damage from floods or flood waters at any place. Speaking for the Court, Circuit Judge Woodruff stated as follows:

> Thus it appears on inspection of the two flood control Acts referred to that when Congress entered upon flood control on the great scale contemplated by the Acts it safeguarded the United States against liability of any kind for damage ·from or by floods or flood waters in the broadest and most emphatic language. The cost of the flood control works itself would inevitably be very great and Congress plainly manifested its will that those costs should not have the flood damages that will inevitably recur added to them. Undoubtedly floods which have traditionally been deemed "Acts of God" wreak the greatest property destruction of all natural catastrophies and where floods occur after flood control work has been done and relied on the damages are vastly increased. But there is no question of the power and right of Congress to keep the government entirely free from liability when floods occur, notwithstanding· the great government works undertaken to minimize them. Congress included Section 3 in the 1928 Act and carried it forward into the 1936 Act and others with intent to exercise that power completely and to absolutely bar any such federal liability. *National Mfg. Co.*, supra, at 270.

After explaining that the 1928 Act of Congress for Federal Flood Control Projects provided explicit obligations to affected owners of property by requiring just compensation for taking of private property for public use, the Court stated that § 3 [702c] prohibited any federal liability for damage from or by floods or flood waters. The Court went on to state:

> ... The ·Federal Tort Claims Act of August 2, 1946, had not been passed in 1928 or 1936 and the government then had a certain sovereign immunity from suit for torts but when Section 3 is read in its context it is clear Congress meant by it that damages from or by floods or flood waters should not afford any basis of liability against the United States regardless of whether the sovereign immunity was availed of or not. The declaration of Section 3 negates the existence of a cause of action against the United States in the situation covered by it.

Undoubtedly that absolute freedom of the government from liability for flood damages is and has been a factor of the greatest importance in the extent to which Congress has been and is willing to make appropriations for flood control and

to engage in costly undertakings to reduce flood damages. *National Mfg. Co.*, supra, at 271.

Also in *National Mfg. Co.*, it was the government's contention, as it is in the instant case, that 28 U.S.C. § 2680(a) bars the claim. It was contended there, as here, that the claims were excepted from coverage of the Act because they were based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the government. And, further, that the activities on which the claims are based are governmental in nature within the meaning of the act. The Court concluded that each of the contentions of the government should be sustained, to wit:

(1) That recovery in the action is barred by § 3 [702c];

(2) That the Federal Tort Claims Act does not repeal said § 3;

(3) That said act does not accord a right of action upon the facts alleged;

(4) That § 2680(h) excepts the claims from the coverage of the act [not applicable];

(5) That § 2680(a) excepts the claims from such coverage.

In *Taylor v. U.S.A.*, 590 F.2d 263 (8th Cir. 1979), *National Mfg. Co.*, supra, is cited as interpreting the scope of immunity of § 702c and was therefore, not a new task for the Court. Judge Stephenson, speaking for the Court, stated *National Mfg. Co.* was the landmark case. He noted that *National Mfg. Co.* has frequently been cited for support for the broad-based immunity granted under § 702c.

Finally, the most recent case opined by the Eighth Circuit Court of Appeals is the case of *Burlison v. United States*, 627 F.2d 119 (8th Cir. 1980). There the Court held:

This Court has previously rejected the approach, taken by some courts, that denies immunity to the government when damage is caused solely by governmental negligence in the absence of a natural disaster. *Lunsford v. United States*, 570 F.2d 221, 228, n. 13 (8th Cir. 1977); see

*Florida East Coast Ry. v. United States*, 519 F.2d 1184, 1191 (5th Cir. 1975); *Parks v. United States*, 370 F.2d 92, 93 (2d Cir. 1966); *Stover v. United States*, 332 F.2d 204, 206 (9th Cir.), cert. denied, 379 U.S. 922, 85 S.Ct. 276, 13 L.Ed.2d 335 (1964). *We remain firm in our belief that this is the proper rule.* When Congress enacted the broad-based immunity of Section 702c, it could not have intended that the government be required to prove, in each and every case, that the damage was caused by "natural" rather than "manmade" flooding. We see no significance in the fact that the flooding in this case may not have been caused by "unusual or extraordinary climatic conditions." Nor are we persuaded that the result should be different if the damage had been caused by "back waters", see *Taylor v. United States*, supra, 590 F.2d at 267, or by negligent maintenance and operation of a project (rather than by negligent design or construction). See *Parks v. United States*, supra, 370 F.2d at 93; *Stover v. United States*, supra, 332 F.2d at 206. *Emphasis supplied.*

This Court has consistently followed the policy that the decisions of the Eighth Circuit Court of Appeals should prevail over decisions on similar questions of other Circuits. Accordingly, the Court is persuaded that recovery in this action by the plaintiff is barred by § 3 of the Flood Control Act of 1928, Title 33 § 702c. The earth berm was constructed to protect the Mississippi River levee from destruction by underwater seepage. This was all part of a federal flood control project. Therefore, the United States is immune from liability for damage caused by flood waters.

The Court makes this finding notwithstanding the fact that the Court is of the opinion that the damages sustained by the plaintiff in the case were the primary result of the gross negligence of the representatives, employees of the Corps of Engineers, in their design and construction of the project and supervision and control of the contractor in carrying out its obligations

and responsibilities for the construction of the project.[2]

The conclusions reached herein on the first question leads to the inevitable decision that the second question be answered in the negative. The *Burlison* case, supra, makes it very clear that it makes no difference if the damage was caused by "natural" rather than "man-made" flooding. Further, there is no significance in the fact that the flooding in the case may not have been caused by "unusual" or "extraordinary climatic conditions". Nor is the Court in anyway "persuaded that the result would be different if the damage had been caused otherwise."

In *National Mfg. Co.*, supra, the Court made it very clear that the Federal Tort Claims Act, 28 U.S.C. § 2680(a), does not repeal § 3 of the Flood Control Act of 1928.

 At page 274, *National Mfg. Co.*, supra, it is pointed out that the act contains a list of the statutes which it declares "are hereby repealed": 60 Stat. 842, 846, 847, and the others so expressly repealed do not include § 3 of the 1928 Act. The Court went on to state, "It is a cardinal principle of construction that repeals by implication are not favored. *United States v. Borden Co.*, 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181. A long settled public policy is not to be overridden by the general terms of a statute which does not show with certainty a legislative intent to depart from that policy. *United States v. Sweet*, 245 U.S. 563, 38 S.Ct. 193, 62 L.Ed. 473." *National Mfg. Co.*, supra, at 274.

Having reached the conclusion that § 702c was not repealed by the Congress in enacting the Federal Tort Claims Act, it is unnecessary to reach the third question, the issue of "discretionary function."

Furthermore, having reached the conclusion that the claim of the plaintiff, Robert E. Dunavant, is barred by § 3 of the Flood Control Act of 1928, 33 U.S.C. § 702c, his claim must be denied and his complaint dismissed.

A separate judgment will be entered in accordance with this opinion.

---

**2.** The Court is not unmindful of the Supreme Court decisions, *Dalehite, et al v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) and *The Indian Towing Co., et al v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

In *Dalehite*, the Court construed the language of the Federal Tort Claims Act, with reference to the responsibilities of the government in connection with the disastrous explosion at Texas City, Texas of ammonia nitrate fertilizer produced at the insistence, according to specifications and under the control of the United States for export, to increase the supplies in areas under military occupation following World War II.

In *Indian Towing Company*, which has been cited in this opinion, the Supreme Court construed the language in 28 U.S.C. § 2674, the Federal Tort Claims Act, with reference to the distinction between "governmental" and "nongovernmental" function which has caused confusion in the law of municipal liability for years. In this 5–4 opinion, the Supreme Court distinguished *Dalehite v. U.S.*

This Court also noted with interest that *Dalehite* was reached by a 4–3 decision with two members of the Court taking no part in the decision as to the application of the Federal Tort Claims Act. This Court must confess that these two cases by the Supreme Court of the United States provided virtually no assistance in its consideration of the Dunavant claim.